UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


    TEAVER                                    CIVIL ACTION

    VERSUS                                    NO: 10-1523

    SEATRAX OF LOUISIANA, INC.                SECTION: "J" (5)
    ET AL.

                           **ORDER AND REASONS**

    Before the Court are Third-Party Defendant Seatrax of Louisiana, Inc.("Seatrax")'s **Motion for Summary Judgment (Rec. Doc. 183)**, Third-Party Plaintiffs Mariner Energy, Inc. ("Mariner"), Alford Services, Inc., and Nova Technical Services, Inc. ("Nova")'s oppositions to same **(Rec. Docs. 190, 191, 192, respectively)**, and Seatrax's reply thereto **(Rec. Doc. 197)**. Seatrax's motion is set for hearing on November 21, 2012. Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that Seatrax's motion should be **GRANTED** for the reasons set out more fully below.

                **PROCEDURAL HISTORY AND BACKGROUND FACTS**

    This action arises out of personal injury claims brought

                                   1

under general maritime law and Louisiana state law. On May 18, 2010, Plaintiff, Robert Teaver ("Teaver"), filed this action in the Twenty-Fifth Judicial District Court for the Parish of Plaquemines, naming as Defendants Seatrax, Mariner, Nova, and John Doe, the hypothetical employee of Nova. In his complaint, Teaver alleges that he was injured while dismantling a crane owned by Seatrax, a crane operator and installer. The crane was located on an off-shore rig owned by Mariner.

Defendants removed the action to this Court on May 20, 2010. On June 18, 2010, Teaver filed a motion to remand the case to state court, arguing that removal was improper because, in addition to general maritime law and Louisiana state law, Teaver had also sought recovery under the Jones Act. (Rec. Doc. 7) On August 23, 2010, this Court denied Teaver's motion finding that he was not a Jones Act seaman and that federal jurisdiction existed under the Outer Continental Shelf Lands Act. (Rec. Doc. 17) On December 2, 2010, this Court dismissed Teaver's claims against Seatrax as a matter of law. (Rec. Doc. 28) On January 5, 2011, Teaver filed his First Amended Complaint (Rec. Doc. 39) adding as a Defendant Corey Sauce, a Nova employee.[1] On October

---

[1] Nova is alleged to have been hired by Mariner to oversee the project management and safety operations and/or inspections on the Mariner platform. (Rec. Doc. 1-3, p. 6, ¶ 18)

25, 2011, Teaver filed his Third Amended Complaint (Rec. Doc. 71) adding as Defendants Alford Services, Inc. ("Alford") and Bruce Alexander, an Alford employee.[2]

On February 28, 2012, Mariner, Bruce Alexander and Alford, and Corey Sauce and Nova filed Third-Party Complaints against Seatrax, bringing Seatrax back into the suit. (Rec. Docs. 120, 114, 117, respectively). The complaints allege that Seatrax is obligated to provide defense, indemnity, and insurance coverage to Mariner pursuant to a Master Service Agreement ("MSA") executed between the parties.[3] The complaints assert that at all times relevant to Teaver's claims, the MSA was in effect between Seatrax and Mariner and, therefore, governs the obligations and liabilities of the parties with respect to the Teaver lawsuit.

On October 2, 2012, Seatrax filed the instant Motion for Summary Judgment. At the request of the parties, the hearing on the motion was continued until November 7, 2012. On November 5,

---

[2] Alford is alleged to have been hired by Mariner to "supervise, inspect, oversee and monitor the safety aspects of the operations being conducted on [the] platform." (Rec. Doc. 71, p. 2, ¶ 3) Bruce Alexander is alleged to have been the "designated safety representative hired by [Alford]" to perform the above-referenced tasks. (Rec. Doc. 71, p. 3, ¶ 5)

[3] The Agreement also applied to any contractors or subcontractors hired by Mariner. Both Alford and Nova allege that at all times relevant to Teaver's claims they were Mariner's contractors or subcontractors under the Agreement. Alford's complaint reports that Alford was hired to provide EMT services. (Rec. Doc. 114, p. 2, ¶ 6) Nova's complaint reports that Nova was hired as a subcontractor or consultant. (Rec. Doc. 117, p. 2, ¶ 5)

2012, due to conflicts of the Court, the motion was continued until its current hearing date of November 21, 2012.

## PARTIES' ARGUMENTS

In its motion, Seatrax argues that the Louisiana Oilfield Anti-Indemnity Act ("LOAIA") applies to the MSA and, therefore, that Seatrax does not have to indemnify Mariner, Nova, or Alford for their own negligence. Seatrax asserts that under LOAIA, indemnity provisions for death or bodily injury are "null and void and against public policy . . . where there is negligence or fault (strict liability) on the part of the indemnitee." (Rec. Doc. 183-2, p. 6 (quoting LA. REV. STAT. § 9: 2780(A))

Specifically, Seatrax contends that the agreement which led to the work it performed for Mariner at the time of the accident (1) pertained to a well used for oil, gas, or water, and (2) such work was related to the exploration, development, production, or transportation of oil, gas, or water as contemplated by the statute. In particular, Seatrax argues that the work orders which formed the agreement in question called for the Seatrax crane to be used in the "plugging and abandoning" of the wells. Seatrax contends that LOAIA's elements are satisfied because: the crane was used in the plugging and abandoning work, the platform where the crane was located was used for production, and the same

platform was located directly above the wells. As such, Seatrax argues that LOAIA's bar to indemnification applies and, therefore, it is not bound to indemnify Mariner, Nova, or Alford.

In response, Mariner, Nova, and Alford ("Third-Party Plaintiffs") argue that LOAIA does not apply. First, the Third-Party Plaintiffs contend that the work orders in place at the time of the accident do not encompass plugging and abandoning work but, rather, pertain only to the isolated dismantling of the crane itself. As such, the Third-Party Plaintiffs aver that the relevant agreement does not pertain to a well. In addition, they argue that the platform was not a production platform for the wells, because the wells in question had been dry since June 2001, and Mariner had no intention of returning them to production status. The Third-Party Plaintiffs contend that, together, these factors indicate that the agreement did not pertain to a well and, therefore, LOAIA does not apply. Alternatively, they argue that even if the agreement did pertain to a well, the activity that Seatrax was engaged in at the time of the accident did not relate to the exploration, development, production, or transportation of oil, gas, or water as required by the statute, because the wells were no longer producing.

In its reply, Seatrax asserts that the distinctions made by

Mariner, Nova, and Alford are both inconsequential and, if adopted, would lead to absurd results. In particular, Seatrax contends that the Court's analysis must focus on the overarching agreement that led to the crane's presence on the platform, rather than the specific act and/or work that was being performed at the time the accident occurred. Seatrax asserts that the work orders issued between January 2009 and June 2009 all indicate that the crane was assisting in the plugging and abandoning of the wells. Seatrax contends that the dismantling of the crane that was taking place when the accident occurred was merely collateral to that work, i.e. after completing the plugging and abandoning of the wells, the crane necessarily had to be dismantled to be removed from the platform and returned to shore. Moreover, Seatrax asserts that the fact that the wells themselves were no longer producing oil is inconsequential, because the plain language of LOAIA includes plugging and abandoning.

While the parties dispute whether or not the agreement between Seatrax and Mariner falls within the statutory language of LOAIA, they do not dispute that Louisiana law applies to this suit via the Outer Continental Shelf Lands Act and, therefore, that LOAIA would apply if the agreement falls within its confines.

## DISCUSSION

### A. Legal Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. Little, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." Delta, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed

verdict if the evidence went uncontroverted at trial.'" Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1263-64 (5th Cir. 1991) (citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." Id. at 1265.

### B. Applicable Law

The Louisiana legislature enacted the LOAIA in order to address "inequities foisted on certain contractors . . . by . . . defense and indemnity provisions . . . contained in some agreements pertaining to wells for oil, gas, or water." LA. REV. STAT. § 9:2780(A). The act provides that in instances in which an agreement calls for "defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee," the provision shall be void and unenforceable, because it runs against public policy. Id. In general, LOAIA is broadly written and broadly interpreted. Roberts v. Energy Dev. Corp., 104 F.3d 782, 784 (5th Cir. 1997).

The United States Court of Appeals for the Fifth Circuit has developed a two-part test for determining whether or not the

act applies to specific agreements. First, the court must determine that the agreement pertains to a well. Transcont'l Gas Pipe Line Corp. v. Transp. Ins. Co., 953 F.2d 985, 991 (5th Cir. 1992). "If the [agreement] does not pertain to a well, the inquiry ends." Id. Second, if the agreement does pertain to a well, then the court must determine that the agreement is "'related to the exploration, development, production, or transportation of oil, gas, or water.'" Id. (quoting LA. REV. STAT. § 9:2780(B)). The statute states that "related to" may include, but is not limited to, activities such as "altering, plugging, or otherwise rendering services in connection with any well drilled for the purpose of produc[tion]," such services may also include collateral services such as "the furnishing or rental of equipment." Id. In making a determination as to whether an agreement pertains to a well, the Fifth Circuit looks at the following factors:

> (1) Whether the structures or facilities to which the contract applies or with which it is associated are part of an in-field production system;
> (2) What is the geographical location of the structure or facility relative to a well or wells;

(3) What is the purpose or function of the facility or structure in question;

(4) Who owns and operates the relevant facility or structure;

> (5) And 'any number of other details affecting the functional and geographic nexus between 'a well' and the structure or facility that is the object of the agreement . . .'

Broussard v. Conoco, Inc., 959 F.2d 43, 45 (5th Cir. 1992) (quoting Transcont'l Gas, 953 F.2d at 994-95). The inquiry into whether an agreement pertains to a well is "a fact intensive case by case analysis." Verdine v. Ensco Offshore Co., 255 F.3d 246, 251-52 (5th Cir. 2001) (citing Transcont'l Gas, 953 F.2d at 994). In most cases, the decisive factor has been the functional and/or geographical nexus between the subject matter of the agreement and a well or wells. Verdine, 255 F.3d at 252. When determining the scope of the agreement, the court should look to the work order that authorized the indemnifying party's work. Roberts, 104 F.3d at 784 (citing Johnson v. Amoco Prod. Co., 5 F.3d 949, 952 (5th Cir. 1993)).

In the instant case, the Court finds that the agreement

between Seatrax and Mariner pertains to a well. In making this determination, the Court looks to the service orders issued between January 2009 and June 2009. Each of these service orders indicates that (1) the location of the Seatrax work occurred on the SMI-136B platform; (2) the reason for the work was "[c]rane operation- construction - P.A. [plug and abandon];" and (3) the crane and crane operator assisted in or performed work directly on the wells.[4] Together, the service orders demonstrate that the Seatrax crane was brought to the SMI-136B platform to assist with the plugging and abandoning of the wells and, therefore, that the scope of the agreement necessarily pertains to the wells.[5]

While the Third-Party Plaintiffs have argued that the Court should only look at the service orders issued on the day of the accident in order to determine the scope of the agreement, the

---

[4] (See generally, Seatrax Ex. A, Rec. Doc. 197-1, pp. 1 - 33) In particular, the Court notes that almost all of these service orders refer to wireline work, slickline work, or electric line work, all of which are part of the plugging and abandoning process, and are used in direct conjunction with wells. Id. Moreover, at least two of the service order specifically reference activities performed on the well. The February 28, 2009 service order states that the operator "[p]ulled off wellhead," and the March 2, 2009 service order states that the operator "[p]ulled tubin [sic] out of wells." Id. at p. 24, 25.

[5] To the extent that the Third-Party Plaintiffs argue that Jack Leezy's affidavit contradicts these service orders because it states that "no Seatrax employee was ever contracted to perform any plug and abandon activities on SMI-136B," the Court finds that just because "no employee" was ever contracted to work on plug and abandon work, it does not necessarily mean that Seatrax as an entity did not contract with Mariner to provide its crane (and operator) for plug and abandon work. In fact, as the January 2009 to June 2009 service order demonstrate, Seatrax *did* contract with Mariner to provide assistance with plug and abandon work.

Court is not persuaded. Limiting the Court's inquiry to those service orders would not only paint an incomplete picture of the scope of the agreement between the parties, but it would also lead to absurd results. In essence, such a limitation would require the Court to find either that Mariner contracted with Seatrax to have Seatrax bring a crane to the SMI-136B platform and to dismantle it, with no other intended use for the crane, and/or that the dismantling of the crane constituted a separate agreement between the parties.[6] Making these findings would mean that contractors are only covered under LOAIA while they are actually performing the contracted work, but not while they perform on-site tasks necessary and incidental to the contracted work. Here, this would draw an arbitrary line between the actual performance of the work and the final steps required for completion of the work, i.e. removal of the equipment. In the face of a service record which clearly demonstrates that the parties contracted to use the crane as part of an overarching plug and abandonment operation, as well as clear statutory language which states that LOAIA covers "act[s] collateral [to

---

[6] As Seatrax points out in its reply, the service orders that were issued for the day of the accident bear the same job number, CR 29007, as the service orders issued between January 2009 and June 2009. As such, even though the service orders only reference dismantling the crane, the implication is that the dismantling occurred as part of the overall job that Seatrax contracted for — plugging and abandoning the wells.

the agreement]," the Court declines to make such findings.

Furthermore, the Court also notes that the factors laid out by the Fifth Circuit also weigh in favor of finding that the agreement pertains to a well. In particular, the work itself was performed on the production platform for the wells, the platform (and crane) were geographically located directly above at least one of the wells, the platform's purpose was to assist in oil and gas production, and the platform and wells were both operated by Mariner.[7] Together, these factors indicate that there was a strong functional and geographical nexus between Seatrax's agreement to supply the crane for the plug and abandon work and the wells.

Although the Third-Party Plaintiffs argue that this nexus is negated because the wells were non-producing and, therefore, the platform was not an "in-field production" platform, the Court finds that this argument is without merit.[8] In Verdine v. ENSCO Offshore Co., the Fifth Circuit specifically stated that "the

---

[7] (Mariner's Opp., Rec. Doc. 190, p. 9 ("In this case, thought [sic] Mariner was the operator of the platform and underlying wells . . .")).

[8] The Third-Party Plaintiffs make the same argument with respect to the second prong of the test for determining whether or not LOAIA applies. Plaintiffs' contend that because the wells were not producing oil and/or gas at the time of the accident, any agreement is "not related to the exploration, development, production, or transportation of oil, gas, or water." See Transcont'l Gas, 953 F.2d at 991. Accordingly, the Court finds this argument lacks merit for the same reasons discussed below.

Louisiana legislature clearly envisioned [LOAIA's] application to agreements for services on structures that were not developing, producing or transporting oil or gas geographically connected to a specific well." 255 F.3d at 253. The court explained that "[LOAIA] encompasses agreements for services on structures intended for use in the oil and gas industry, so long as the agreement pertains to a well." Id. at 253-54. In the instant case, while the wells were no longer producing oil, it is clear from the Third-Party Plaintiffs' oppositions and exhibits that the wells had previously produced oil, and the platform had previously been an in-field production platform.[9] Thus, the platform falls into the Fifth Circuit's description of a structure that was "intended for use in the oil and gas industry," indicating that LOAIA applies. See id.

Moreover, even without looking at Verdine, LOAIA specifically states that agreements may be related to "plugging, or otherwise rendering services in connection with any well drilled for the purpose of produc[tion]." LA. REV. STAT. § 9:2780. As noted, the agreement between Seatrax and Mariner was for use of the crane in the plugging and abandoning of the well. Thus,

---

[9] (See, e.g., Mariner's Opp., Rec. Doc. 190, p. 9-12 ("Though the SMI-136B was located above non-producing wells, its function *was no longer* related to production."(emphasis added)) ("The wells had not produced since 2001.")).

14

the plain language of the statute encompasses the agreement at issue and, therefore, LOAIA applies. For the above reasons,

**IT IS HEREBY ORDERED** that Seatrax's motion is **GRANTED**.

**IT IS FURTHER ORDERED** that Mariner, Alford, and Nova's claims for indemnity against Seatrax should be and are hereby **DISMISSED with prejudice**. All other third-party claims against Seatrax are maintained.

New Orleans, Louisiana this 19th day of November, 2012.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE